No. 86-487

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

---

STATE OF MONTANA

          Plaintiff/Respondent,

     vs.

LARRY KAY SMITH

          Defendant/Appellant,

---

APPEAL FROM:  District Court of the Fourth Judicial District,
              In and for the County of Missoula
              The Honorable John S. Henson, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          O'BRIEN & CONRAD; James P. O'Brien,
          Missoula, Montana,

     For Respondent:

          Honorable Mike Greely, Attorney General,
          John Paulson, Assistant Attorney General,
          Helena, Montana,
          Robert L. Deschamps, III, Missoula County Attorney,
          Missoula, Montana.

---

                              Submitted on Briefs: June 25, 1987

                              Decided:  September 3, 1987

Filed:  SEP 3 - 1987

                    *Ethel M. Harrison*
          _____
                         Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Defendant, Larry K. Smith, appeals a jury verdict convicting him of aggravated kidnapping in the Fourth Judicial District, Missoula County. Defendant also appeals the sentence imposed. We affirm. The issues are:

1. Is the evidence sufficient to sustain Mr. Smith's conviction of aggravated kidnapping?

2. Were the District Court's instructions adequate?

3. Did the District Court abuse its discretion by not applying the reduced penalty provisions of § 45-5-303(2), MCA, when sentencing the defendant?

The following uncontradicted facts come from the State's case-in-chief. At approximately 12:30 a.m. on the night of February 28, 1986, the victim, a 20-year-old University of Montana sophomore, and a friend walked from their dormitory to Luke's Bar in downtown Missoula. Later, when they left the bar they met the defendant, Mr. Smith, who was seated on a three-wheel motorcycle.

In the course of conversation, Mr. Smith asked the victim if she would like to go for a ride on his motorcycle. The victim eventually assented, generally agreeing to a "ride around the block" because it sounded like fun.

The victim got on the passenger seat. Rather than drive around the block, Mr. Smith drove south for several blocks, then made a U-turn and drove north again. Upon approaching the bridge over the river, Mr. Smith drove down toward the river where a restaurant is located. The victim admitted that she began to be concerned at that point, but she assumed Mr. Smith would turn around in the parking lot. Mr. Smith proceeded, however, past the restaurant to the end of the parking lot, then further west past the parking lot on a dirt

path.    As they continued west along the path, they drove underneath a traffic bridge and stopped.

Mr. Smith, a paraplegic, turned his body to the right, lifted or threw his left leg over the bike and grabbed the victim's wrists.    He ordered the victim to get off of the motorcycle.    When she was standing in front of him, Mr. Smith pulled her toward himself as if to kiss her.    The victim pulled away and told Mr. Smith, "No."

The victim testified that at that point Mr. Smith "seemed very anxious -- very angry and very agitated."    He either lowered himself to the ground while still holding the victim's wrists firmly or the victim pulled away and he fell to the ground.    He tried to pull the victim down to the ground, but she jerked away and turned to run.    Mr. Smith caught the victim's left leg, pulling her to her knees on the ground.    A medical doctor and Mr. Smith's girlfriend both testified that Mr. Smith was very strong in his upper body. He grabbed the victim's hair and began hitting her, calling her a "bitch" and a "whore".    The following is a portion of the victim's testimony:

> Q.   Okay.   You say you were on your knees.   Can you describe for the jury how he was hitting you?
>
> A.   He was hitting me very sharply in the back of the head with his fists.   And then he was -- he was hitting me, like, with karate chops to the back of the neck, very strong, very hard blows.
>
> Q.   And what was he telling you to do?
>
> A.   Kept telling me to get my face in the dirt. Told me if I didn't keep my head down, he was going to hit me in the back of the head with a rock and cut off my head and cut off my hair.
>
> Q.   What did you do then?
>
> A.   I put my face down in the dirt.

Q. About how many times do you think he gave you a karate chop?

A. Oh, probably six to seven times.

Q. Can you tell us how it felt?

A. It was very painful. It was so hard that I felt as though I might pass out, and I was, you know, seeing stars. And so I tensed up as hard as I could to resist the blows.

When the victim's face was in the dirt, Mr. Smith released his hold on her and scooted toward his motorcycle. The victim testified that she thought he was reaching into his motorcycle to get something. She used this opportunity to get up and run away from Mr. Smith. She ran some distance to a footbridge which crosses a ditch. She ran across that footbridge and up to a residential street. The victim was afraid Mr. Smith might find her again so she kept running, eventually hiding behind a bush until certain he was driving in the opposite direction.

Mr. Smith was convicted of aggravated kidnapping. The District Court, upon adjudging Mr. Smith a dangerous offender, sentenced him to 20 years in the Montana State Prison.

I

Is the evidence sufficient to sustain Mr. Smith's conviction of aggravated kidnapping?

Section 45-5-303(1), MCA, reads in part:

A person commits the offense of aggravated kidnapping if he knowingly or purposely and without lawful authority restrains another person . . . by using or threatening to use physical force, with any of the following purposes:

. . .

(c) to inflict bodily injury on or to terrorize the victim or another . . . .

4

Mr. Smith argues this as a "specific intent" crime. In labelling the offense as such, Mr. Smith claims the prosecution must prove he had some "future mental state" to inflict bodily injury on or to terrorize the victim. Mr. Smith argues that this intent may not be inferred from his acts.

The language used when discussing mental state should be chosen cautiously to avoid confusion. The distinctions between "general" and "specific" intent were abandoned when the Montana Criminal Code was adopted. State v. Howard (1981), 195 Mont. 400, 407, 637 P.2d 15, 19.

The initial mental state which the State must prove is that the defendant knowingly or purposely restrained another person. The State also must prove that the defendant restrained the victim with the purpose "to inflict bodily injury on or to terrorize the victim . . . ." § 45-5-303(1)(c), MCA. Contrary to Mr. Smith's argument, proof of this additional mental state does not require proof of a "specific intent" as found under common law, but, rather, requires proof of "purpose" as statutorily defined.

Mr. Smith argues that the State failed in its burden to prove beyond a reasonable doubt that he had the purpose to inflict bodily injury on or to terrorize the victim. Mr. Smith's argument is based on his incorrect assumption that this purpose may not be inferred from his acts. Section 45-2-103(1), MCA, states:

> (1) A person is not guilty of an offense, other than an offense which involves absolute liability, unless, with respect to each element described by the statute defining the offense, he acts while having one of the mental states described in subsections (33), (37), and (58) of 45-2-101. The existence of a mental state may be inferred from the acts of the accused and the facts and circumstances connected with the offense. (Emphasis added.)

5

Section 45-2-101(58) defines "purpose" or "purposely":

> [A] person acts purposely with respect to a result or to conduct described by a statute defining an offense if it is his conscious object to engage in that conduct or to cause that result . . . .

These statutes, read together, show that a defendant's purpose or conscious object may be inferred from his acts as well as from the facts and circumstances of the offense. The State was required to show that Mr. Smith knowingly or purposely restrained the victim with a purpose to inflict bodily injury on or to terrorize her. The fact that an additional mental state or "purpose" must be shown does not bar the trier of fact from inferring such purpose from the acts of the defendant and the facts and circumstances of the offense. Howard should not be read to reassert the common law distinction between specific and general intent accompanied by the differing schemes of proof, as Mr. Smith argues.

In the light most favorable to the State, when Mr. Smith grabbed the victim by the wrists and later grabbed her by the leg and pulled her to the ground by her hair, the jury could reasonably conclude that Mr. Smith knowingly or purposely restrained her. Further, the jury could reasonably conclude from Mr. Smith's conduct that he restrained the victim for the purpose of inflicting bodily injury on or terrorizing her. The defendant threatened to cut the victim's hair and head off, and in fact beat her on the head and neck repeatedly.

> The intent to restrain and the restraint, for any of the enumerated purposes, are the facts the jury must determine to establish an accused's guilt of aggravated kidnapping. No additional facts need be proved in order to constitute the crime.

6

State v. Stewart (1977), 175 Mont. 286, 300, 573 P.2d 1138, 1146.

Mr. Smith further asserts that the aggravated kidnapping statute does not contemplate "momentary restraints which are normally the subject of simple assaults." The statute requires no specific proof regarding duration of restraint. If a specific period of time were required, then a fortunate escape by the victim, short of that specified length of time, would cut short the defendant's liability regardless of defendant's purpose and actions. Time is not the concern of the statute, but, rather, concern is for violence, terror, and danger while the victim is restrained. Model Penal Code and Commentaries § 212.1 (1980). Montana's aggravated kidnapping statute is based upon the Model Penal Code § 212.1 (1962), the official draft of which required restraining "for a substantial period." As the State correctly points out, the Criminal Law Commission and the Montana Legislature expressly omitted that element. A specific period of restraint is not an element of the offense. We hold that sufficient evidence exists in the record to support Mr. Smith's conviction for aggravated kidnapping.

## II

Were the District Court's instructions adequate?

Mr. Smith contends the District Court erred by giving instructions 12 (definition of restraint) and 18 (withdrawal of consent). He failed to object to instructions 12 and 18 at trial. Generally, instructions cannot be challenged for the first time on appeal.

Mr. Smith argues that there is plain error involved which allows us to review the instructions under the holding in State v. Lundblade (Mont. 1981), 625 P.2d 545, 38 St.Rep. 441. In that case, we held that failure to give an instruction on the elements of the crime constituted plain error

7

under § 46-20-702, MCA (1981). <u>Lundblade</u> is no longer authority under this theory because § 46-20-702, MCA, was amended in 1983 to read as follows:

> Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. No claim alleging an error affecting jurisdictional or constitutional rights may be noticed on appeal, if the alleged error was not objected to as provided in 46-20-104, unless the defendant establishes that the error was prejudicial as to his guilt or punishment and that:
> (1) the right asserted in the claim did not exist at the time of the trial and has been determined to be retroactive in its application;
> (2) the prosecutor, the judge, or a law enforcement agency suppressed evidence from the defendant or his attorney that prevented the claim from being raised and disposed of; or
> (3) material and controlling facts upon which the claim is predicated were not known to the defendant or his attorney and could not have been ascertained by the exercise of reasonable diligence.

Mr. Smith has failed to establish that the claimed error was prejudicial and that he meets one of the three qualifying requirements of the section.

Mr. Smith also contends that the instructions can be reviewed under State v. LaValley (1983), 203 Mont. 393, 661 P.2d 869. <u>LaValley</u> is not authority because there is no present contention of ineffective assistance of counsel. We conclude there was no error in giving instructions 12 and 18.

Mr. Smith next contends that three additional instructions should have been given. He argues that the trial court failed to give an instruction defining force. No Montana statute defines force as used in this instance. He argues that a specific intent instruction was required; however, no requirement by law has been established. Last, Mr. Smith argues that it was error to omit a lesser included offense instruction on unlawful restraint. He cites as authority

State v. Thomas (1966), 147 Mont. 325, 413 P.2d 315; State v. Sotelo (Mont. 1984), 679 P.2d 779, 41 St.Rep. 568; State v. Furlong (Mont. 1984), 690 P.2d 986, 41 St.Rep. 2096. Each of these cases is distinguishable by the fact that in each case the error cited by this Court was the trial court's denial of defendant's proffered instructions concerning a lesser included offense. In the case at bar, the defendant, Mr. Smith, never offered an instruction on unlawful restraint as a lesser included offense. He failed to present any of the instructions to the trial court. "Before the trial court will be put in error it must be given a chance to correct itself." State v. Walker (1966), 148 Mont. 216, 223, 419 P.2d 300, 304. We conclude there was no error in omitting instructions concerning force, specific intent and unlawful restraint.

## III

Did the District Court abuse its discretion by not applying the reduced penalty provisions of § 45-5-303(2), MCA, when sentencing the defendant?

When the District Court imposes a sentence for aggravated kidnapping, § 45-5-303(2), MCA, provides flexibility in sentencing a defendant who (1) voluntarily releases the victim, (2) in a safe place, and (3) not suffering from serious bodily injury. If these three factors are satisfied, the sentence may not exceed 10 years. Although the District Court made no specific findings regarding these factors, sufficient evidence exists in the record to support the District Court's decision not to apply the reduced sentencing provisions.

Mr. Smith argues that when he released his grip on the victim and moved toward his motorcycle, his conduct constituted voluntary release. The record shows that the release of Mr. Smith's grip on the victim was immediately preceded by

beatings and threats to cut off her head and threats to hit her with a rock if she did not keep her head down. The District Court certainly would be justified in refusing to perceive this conduct as a voluntary release. The court also would be justified in concluding, even assuming voluntary release, that the victim was not released in a safe place. The offense occurred under a dark overpass near the river at approximately 2:00 a.m. The fact that the victim did eventually reach safety is not at issue. We hold that the District Court did not abuse its discretion by refusing to apply a reduced penalty pursuant to § 45-5-303(2), MCA.

Affirmed.

_____
Justice

We Concur:

_____
_____
_____
_____
Justices